Slip Op. 19-112

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| WANXIANG AMERICA CORPORATION,<br><br>               Plaintiff,<br><br>    v.<br><br>UNITED STATES,<br><br>               Defendant. | Before: Gary S. Katzmann, Judge<br>Court No. 18-00120 |

## OPINION

[The court grants defendant's motion to dismiss for lack of subject matter jurisdiction.]

Dated: August 19, 2019

William R. Isasi, Alexander D. Chinoy, Elisa S. Solomon, and T. Scott Shelton, Covington & Burling, LLP, of Washington, DC, argued for plaintiff.

Stephen C. Tosini, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With him on the brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. With them on the supplemental brief was Stephen H. Hunt, Assistant Attorney General. Of counsel was James Ahrens, Office of Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC. With him on the brief was Steven J. Holtkamp, U.S. Customs and Border Protection, of Chicago, IL.

      Katzmann, Judge: This is a case about jurisdiction through the lenses of the anti-dumping statute and the Administrative Procedure Act. At its center is a challenge brought by an importer to a memorandum prepared by one government component for another in an anti-dumping investigation. Plaintiff Wanxiang America Corporation ("WAC") imported goods from Wanxiang Qinchao, Co., Ltd., ("WQ"). Both WAC and WQ are subsidiaries of Wanxiang Group Corporation ("WG"). WG and WAC participated in previous anti-dumping administrative reviews and were

determined not to be subject to anti-dumping duties on Chinese tapered roller bearings ("TRBs");[1] WQ, however, was never reviewed.

WAC now invokes this court's residual jurisdiction under 28 U.S.C. § 1581(i), arguing that the United States Department of Commerce ("Commerce") violated anti-dumping duty laws and due process principles by providing guidance to the United States Customs and Border Protection ("CBP") in a memorandum stating that WQ had never been reviewed and thus was not entitled to WG's 0% anti-dumping rate. According to WAC, this communication constituted a final agency action improperly made, without notice, outside established anti-dumping duty procedures. For its part, Defendant the United States ("the Government") counters that the proper way to obtain relief would have been to subject WQ to administrative reviews -- just as WAC and WG had been – and to seek redress in this court under 28 U.S.C. § 1581(c). According to the Government, because this court could have had jurisdiction under 28 U.S.C. § 1581(c), this suit is itself an improper attempt to circumvent established anti-dumping procedures and to transform an information memorandum into a new final agency action.

The court concludes that because jurisdiction could have been invoked under 28 U.S.C. § 1581(c), residual jurisdiction under 28 U.S.C. § 1581(i) is not available. Moreover, although WAC contends otherwise, the Commerce guidance to CBP is not a reviewable Administrative Procedure Act ("APA") final agency action. The court grants the Government's motion to dismiss for lack of subject matter jurisdiction.

---

[1] A "bearing" is "a machine part in which another part (such as a journal or pin) turns or slides." *Bearing*, Merriam Webster, https://www.merriam-webster.com/dictionary/bearing (last visited Aug. 15, 2019). "TRBs are a type of antifriction bearing made up of an inner ring (cone) and an outer ring (cup). Cups and cones sell either individually or as a preassembled 'set.'" <u>NTN Bearing Corp. of Am. v. United States</u>, 127 F.3d 1061, 1063 (Fed. Cir. 1997).

## BACKGROUND

### I.　　Legal Framework

#### A.　　*Anti-Dumping and Countervailing Duty Proceedings*

Dumping occurs when a foreign company sells a product in the United States for less than fair value -- that is, for a lower price than in its home market. Sioux Honey Ass'n v. Hartford Fire Ins., 672 F.3d 1041, 1046 (Fed. Cir. 2012). Similarly, a foreign country may provide a countervailable subsidy to a product and thus artificially lower its price. U.S. Steel Grp. v. United States, 96 F.3d 1352, 1355 n.1 (Fed. Cir. 1996). To empower Commerce to offset economic distortions caused by dumping and countervailable subsidies, Congress enacted the Tariff Act of 1930.[2] Sioux Honey Ass'n, 672 F.3d at 1046–47. Under the Tariff Act's framework, Commerce may -- either upon petition by a domestic producer or of its own initiative -- begin an investigation into potential dumping or subsidies and, if appropriate, issue orders imposing duties on the subject merchandise. Id.

19 U.S.C. § 1592 grants CBP the authority to impose a monetary penalty for tariff misclassification.[3] If CBP determines that a company has failed to deposit required anti-dumping duties or has misclassified merchandise, it may issue a pre-penalty notice to inform the company that it is contemplating issuing a claim for a monetary penalty under 19 U.S.C. § 1592(b)(1). CBP then investigates to determine whether there was a violation of anti-dumping laws and, if applicable, the appropriate penalty amount. CBP must prove both that an entry occurred through

---

[2] Further citations of the Tariff Act of 1930 are to the relevant portions of Title 19 of the U.S. Code, 2012 edition.

[3] Under 19 U.S.C. § 1592(b)(1)(A): "If [CBP] has reasonable cause to believe that there has been a violation of subsection (a) and determines that further proceedings are warranted, it shall issue to the person concerned a written notice of its intention to issue a claim for a monetary penalty."

the use of a material false statement (or omission) and that such statement occurred as a result of the alleged violator's culpability. 19 U.S.C. § 1592(a). 19 U.S.C. § 1592(e) provides for de novo judicial review of "all issues, including the amount of penalty" in any proceeding to recover a penalty under the statute. Thus, the classification of the merchandise, giving rise to both a claim for additional duties owed and penalties in this case, would be open to review by the court in a judicial action to recover the penalty regardless of the fact that the entries in question have been liquidated, or of any conclusions of the auditors or import specialists regarding this issue.

### B. *Jurisdiction*

The court's jurisdiction is governed by 28 U.S.C. § 1581. Relevant to this case are subsections (c) and (i). Under 28 U.S.C. § 1581(c), the court has exclusive jurisdiction over any civil action commenced under section 516A or 517 of the Tariff Act of 1930.[4] Under 28 U.S.C § 1581(i), the court has residual jurisdiction to hear any civil action against the United States "that arises out of any law of the United States providing for" importation revenues, tariffs and duties, embargoes, and administration and enforcement of matters involving section 515 of the Tariff Act.[5] The court's residual jurisdiction under 28 U.S.C. § 1581(i) may not be invoked when

---

[4] Under 28 U.S.C. § 1581(c), the court has exclusive jurisdiction over "any civil action commenced under section 516A or 517 of the Tariff Act of 1930." Sections 516A and 517 of the Act describe various types of decisions that can be challenged, including the final results of an anti-dumping or countervailing duty administrative review or investigation, changed circumstances review, or a decision reached by the International Trade Commission during the course of such an investigation.

[5] 28 U.S.C. § 1581(i) provides that the court has exclusive jurisdiction over:

> any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for— (1) revenue from imports or tonnage; (2) tariffs, duties, fees or other taxes on the importation of merchandise for reasons other than the raising of revenue; (3) embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety; or (4) administration and enforcement

jurisdiction under another subsection of 28 U.S.C. § 1581 is or could have been available, unless the remedy provided under that other subsection would be manifestly inadequate. Ford Motor Co. v. United States, 688 F.3d 1319, 1323 (Fed. Cir. 2012).

### II.     *Factual Background and Procedural History*

Although Commerce's memorandum memorializing its guidance to CBP concerning the entities entitled to WG's 0% AD rate was published approximately three years ago, the origins of this dispute date back almost three decades. Commerce first published the anti-dumping on TRBs from China on May 27, 1987. See Tapered Roller Bearings From the People's Republic of China; Final Determination of Sales at Less Than Fair Value, 52 Fed. Reg. 19748 (Dep't Commerce May 27, 1987) ("AD Order"). Following Commerce's publication of the AD Order, WG participated in several administrative reviews between 1995 and 2001. Public Compl., ¶¶ 21–24, 43–45, May 23, 2018, ECF No. 5 ("Compl."). Commerce applied a de minimis rate of .11% for the administrative review for the 1995 to 1996 period and a rate of 0% for the periods covering 1996 to 1997, 1998 to 1999, 1999 to 2000, and 2000 to 2001. See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China; Amended Final Results of Antidumping Duty Administrative Review, 67 Fed. Reg. 46176, 46177 (Dep't Commerce July 12, 2002) ("Amended Final Results of the 2000–2001 Administrative Review"); Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China; Final Results of 1996–1997 Antidumping Duty Administrative Review and New Shipper Review and Determination Not To Revoke Order in Part, 63 Fed. Reg. 63842, 63859 (Dep't Commerce Nov. 17, 1998); Tapered Roller Bearings and Parts Thereof, Finished and Unfinished; Amended Final

---

with respect to the matters referred to in paragraphs (1)–(3) of this subsection and subsections (a)–(h) of this section.

Results of 1998–1999 Administrative Review, 66 Fed. Reg. 11562, 11563–64 (Dept' Commerce Feb. 26, 2001); Tapered Roller Bearings and Parts Thereof, Finished and Unfinished; Final Results of 1999–2000 Administrative Review, 66 Fed. Reg. 57420, 57421–22 (Dep't Commerce Nov. 15, 2001) ("Final Results of the 1999–2000 Administrative Review"); Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China: Amended Final Results of 2000–2001 Administrative Review, 67 Fed. Reg. 72147 (Dep't Commerce Dec. 4, 2002). In the administrative reviews covering Chinese TRBs for 1999 to 2000 and 2000 to 2001, WG had asked Commerce to rescind the AD Order as it applied to WG because WG had a de minimis or 0% antidumping duty margin during the preceding three years. Commerce rejected these requests and thus the AD Order remained in force as to WG at the time of the subject entries. Final Results of the 1999–2000 Administrative Review, 66 Fed. Reg. at 57422; Amended Final Results of the 2000–2001 Administrative Review, 67 Fed. Reg. at 72147. Because Commerce has not examined WG since 2002, the 0% anti-dumping rate continues to apply to WG.

According to the complaint, WAC is a WG "subsidiary" and "has customarily acted as importer of record for these entries" of merchandise produced or exported by WG. Compl. ¶¶ 8, 28. Despite Commerce's refusal to rescind the AD Order, as discussed above, WAC nonetheless imported the subject entries as type "01" ordinary consumption entries, rather than type "03" anti-dumping or countervailing duty entries on its CF7501 commercial entry forms. Public Def.'s Mot. to Dis. at 6–7, Jul. 26, 2018, ECF No. 25 ("Def.'s Br.") (citing Decl. of Amy Johnson at Conf. Ex. B, Jul. 20, 2018, ECF No. 24).[6]

---

[6] CBP's regulation, 19 C.F.R. § 142.3, sets forth the required content of what is commonly called an "entry packet." This includes the "entry summary" or "CBP Form 7501" ("CF7501"). Additionally, importers must file at the time of entry "evidence of the right to make entry"; a "commercial invoice"; and a "packing list." See generally 19 C.F.R. § 142.3(b)(1). "The entry summary filed for merchandise subject to an antidumping or countervailing duty order shall

Commerce never reviewed WQ, the alleged exporter of the subject wheel hub assemblies in this case, and thus never assigned WQ a separate rate during an anti-dumping proceeding. Compl. at Ex. 1, Department of Commerce, Customs Liaison Unit, Memorandum to Customs and Border Protection (May 25, 2016) ("CLU Memo"), at Attach. 1, Department's February 25, 2015 Guidance to CBP. According to the complaint, although another WG subsidiary, the Wanxiang Import and Export Company ("WIE"), acted as WG's primary exporter between April 2011 and early 2012, WQ exported the group's automobile components, which are the entries underlying this dispute. Compl. ¶ 28. On December 27, 2012, after WQ began exporting the subject merchandise, CBP informed WAC that it would perform an audit to investigate classification and AD duty issues. Id. at ¶ 33. On June 26, 2013, Commerce announced that Wanxiang Special Bearing Company ("WSB") and WIE were subsidiaries of WG in an Automated Commercial Environment ("ACE")[7] note. CLU Memo at Attachment 3, Note in ACE. The ACE note was silent on WQ. Id.

CBP issued its initial audit results on October 22, 2014, in which it concluded that WQ was not considered to be part of WG and that the PRC-wide rate of 92.84% applied to its entries.[8] Compl. ¶ 34. WAC responded to CBP's initial audit results on November 5, 2014 through counsel.

---

include the unique identifying number assigned by the Department of Commerce . . ." 19 C.F.R. § 141.61(c).

[7] ACE is a secure portal system that CBP uses to communicate with the trade community including trade-focused government agencies. CUSTOMS AND BORDER PROTECTION, ACE AUTOMATED BROKER INTERFACE (ABI) AND CBP AND TRADE AUTOMATED INTERFACE REQUIREMENTS (CATAIR), https://www.cbp.gov/trade/ace/catair (last visited Jul. 24, 2019).

[8] During the administrative review period covering June 1, 2010 through May 31, 2011, Commerce established that it would apply a PRC-wide rate of 92.84% to entities that had failed to establish that they were not under the control of the PRC government. See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished; Final Results of 2010–2011 Administrative Review, 78 Fed. Reg. 3396, 3397 (Dep't Commerce Jan. 26, 2013).

Compl. ¶ 35. WAC asserted that WQ was entitled to WG's anti-dumping rate because it was a subsidiary of WG and because WQ and WIE share exporting personnel. Id.

CBP issued the final results of its audit to WAC on September 2, 2015, in which it reiterated that WQ was not eligible for WG's anti-dumping rate and that the merchandise was subject to the AD Order. Compl. ¶ 36 (citing Excerpt of Final Results of CBP Audit at Ex. 4 (Sept. 2, 2015)). Because WAC was not satisfied with CBP's audit results regarding WQ's anti-dumping rate, it met with the Secretary of Commerce and the Under Secretary of Commerce for International Trade in September 2015 to request that Commerce review CBP's views. Compl. ¶ 39 (citing Letter from Department of Commerce to File at Ex. 5 (Jan. 6, 2016)).

On May 25, 2016, Commerce's Customs Liaison Unit published a memorandum on the record: "Tapered Roller Bearing and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Guidance to CBP." CLU Memo. The CLU Memo stated:

> In response to a request from [CBP], on February 25, 2015, the Department of Commerce . . . provided guidance to CBP regarding the entities in the 1994–2001 administrative review periods that were entitled to the Wanxiang Group Corporation's cash deposit rate. Attached is the Department's guidance to CBP's inquiry.
>
> Please note that this memorandum does not constitute new factual information on the record of this closed segment of the proceeding.

Id. The memorandum included three attachments: (1) Commerce's February 25, 2015 guidance to CBP; (2) the organizational chart provided by WG (summarizing the information submitted by WG during the 1994 to 2001 administrative review periods) that was attached to the February 25, 2015 guidance; and (3) the June 26, 2013 ACE note, referenced above. The February 25, 2015 guidance to CBP concerned the entities entitled to WG's 0% anti-dumping rate. See Department's February 25, 2015 Guidance to CBP. In it, Commerce indicated that it had reviewed WG's original questionnaire responses from 1994 to 2001 and determined that WIE and WSB were the group's

only producers and exporters of record. See id. However, none of the document submissions suggested that WQ occupied a similar relationship to WG or was a manufacturer or exporter of the subject merchandise.[9] Id.

On January 17, 2018 CBP issued a pre-penalty notice to WAC under 19 U.S.C. § 1592(b). Compl. ¶ 12 (citing Excerpt of Customs and Border Protection Pre-Penalty Notice at Ex. 2 (Jan. 18, 2018)). The notice stated that CBP was "contemplating issuing a demand for . . . lost revenue and . . . penalty" in connection with WAC's failure to disclose that its entries were subject to anti-dumping duties." Id. at ¶ 53. The notice stated that CBP intended to apply the PRC-wide rate of 92.84% rather than WG's 0% anti-dumping rate. Id. CBP's investigation remains ongoing. Def.'s Br. at 17 (citing Excerpt of Customs and Border Protection Pre-Penalty Notice); Joint Status Report, July 24, 2019, ECF No. 51.

On May 23, 2018, WAC filed a complaint in this court challenging "Commerce's determination published in May 2016 concerning the entities that are entitled to [WG]'s AD rate as well as the policy or practice through which Commerce reached that determination." Compl.

---

[9] The February 25, 2015 memorandum to CBP stated: "Commerce based its decision to treat . . . WSB and . . . WIE as part of [WG] on a review of [WG's] questionnaire responses, . . . organizational charts, and . . . a verification report. Department's February 25, 2015 Guidance to CBP. Commerce further explained that "neither Commerce nor [WG] identified any entity other than WIE and WSB as being producers and/or exporters of subject merchandise. Id. In other words, while [WG] provided organizational charts and identified and described other affiliates, [WG] did not identify these affiliates as either a manufacturer or an exporter of the subject merchandise . . . and did not make determinations" for any other affiliates. Id. Further, it stated with respect to WQ: "WQ appears in [WG's] organizational charts beginning in the 1994–1995 (administrative review periods), in which it is identified only as a subsidiary, not a wholly-owned subsidiary. The first description [WG] provides of WQ is in the 1998–1999 (administrative review period)" in which WG describes WQ as "a stock company that handles all of the manufacturing of the group" and describes WSB as "the exclusive producer of subject merchandise." Id. But, none of the documents, Commerce notes, "clearly identified WQ itself as being a manufacturer or exporter of subject merchandise." Id. Finally, Commerce concluded that "no evidence [it] reviewed suggested that WQ exported the subject merchandise during" the 1994–2001 administrative review periods. Id.

Case 1:18-cv-00120-GSK   Document 52   Filed 08/19/19   Page 10 of 18
Court No. 18-00120                                                                                    Page 10

¶¶ 55–69. On July 26, 2018, the Government filed a motion to dismiss for lack of subject matter jurisdiction. Def.'s Br. On September 18, 2018, WAC filed its response to the Government's motion to dismiss. Pl.'s Opp'n to Mot. to Dismiss at 13, Sept. 18, 2018, ECF No. 27 ("Pl.'s Br."). The Government filed its reply on October 17, 2018. Def.'s Public Reply in Support of Mot. to Dismiss, Oct. 17, 2018, ECF No. 29 (Def.'s Reply"). Oral argument was held in this court on June 25, 2019. ECF No. 44.

## STANDARD OF REVIEW

The standard of review in this action is set forth in 19 U.S.C. § 1516a(b)(1)(B)(i): "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with the law."

## DISCUSSION

WAC argues that Commerce violated basic due process principles and the procedural requirements of anti-dumping law by giving guidance to CBP without providing WAC with (1) contemporaneous notice of its decisions; (2) an evidentiary basis for its decisions; and (3) an opportunity to comment or review the evidence before decisions were made. Compl. ¶ 2. WAC further argues that Commerce has made a practice or policy of making ad hoc, undocumented, undisclosed, and individualized determinations. Id. at ¶ 3. WAC also contends that this court has jurisdiction over its challenge because Commerce's guidance constituted a final agency action. For the reasons stated below, the court grants the Government's motion to dismiss for lack of subject matter jurisdiction.

> **I.    The court does not have jurisdiction under 28 U.S.C. § 1581(i) over WAC's challenge to Commerce's memorandum to CBP because WAC could have invoked jurisdiction under 28 U.S.C. § 1581(c).**

In matters brought under 28 U.S.C. § 1581(i), "jurisdiction may not be invoked when jurisdiction under another subsection of 28 U.S.C. § 1581 is or could have been available, unless the remedy provided under that other subsection would be manifestly inadequate." Norcal/Crosetti Foods, Inc. v. United States, 963 F.2d 356, 359 (Fed. Cir. 1992) (quoting Miller & Co. v. United States, 824 F.2d 961, 963 (Fed. Cir. 1987)); see also Erwin Hymer Grp. N. Am. v. United States, 930 F.3d 1370 (Fed. Cir. 2019).  WAC argues that the court has residual jurisdiction over this case under 28 U.S.C. § 1581(i) because it could not seek relief in any other way.  WAC contends that Commerce's memorandum was the product of a determination "made outside of any administrative review proceeding" and "rendered in a manner devoid of basic due process." Pl.'s Br. at 2.  WAC characterizes Commerce's CLU Memo as emblematic of Commerce's "fundamentally flawed policy of making . . . secretive determinations." Id.  The court is not persuaded.

As has been noted, the CLU Memo, which details the attached February 25, 2015 guidance, was a communication to CBP regarding the entities in the 1994–2001 administrative review periods that were entitled to WG's cash deposit rate.  See CLU Memo; Department's February 25, 2015 Guidance to CBP.  Commerce did not make a new determination in the CLU Memo; it merely reviewed WAC's old questionnaire responses and communicated that "neither Commerce nor [WG] identified any entity other than WIE and WSB as being producers and/or exporters of subject merchandise" in prior administrative reviews.  Id.  Commerce further noted that its "memorandum does not constitute new factual information on the record of this closed segment of the proceeding." Id.

"In ascertaining whether jurisdiction is proper, we look to 'the true nature of the action.'" Juancheng Kangtai Chemical Co., Ltd. v. United States, -- F.3d --, 2019 WL 3676346, at *3 (Fed. Cir. July 15, 2019) (quoting Norsk Hydro Can., Inc. v. United States, 472 F.3d 1347, 1355 (Fed. Cir. 2006)). Here, in challenging the CLU Memo's conveyance of information from long-completed reviews, WAC is seeking a reconsideration of WQ's AD rate based on the records of those reviews. If WG wanted to challenge Commerce's finding with respect to WQ's anti-dumping rate, it should have done so by timely challenging the results of those administrative reviews under 28 U.S.C. § 1581(c). WG chose not to do so. Because that type of relief could have been available under a 28 U.S.C. § 1581(c) action,[10] the court's residual jurisdiction cannot be invoked.[11] Sunpreme Inc. v. United States, 892 F.3d 1186, 1191 (Fed. Cir. 2018); Juancheng Kangtai, 2019 WL 3676346, at *4.

This conclusion is consistent with Federal Circuit precedent. In Sunpreme Inc. v. United States, plaintiff Sunpreme challenged in this court CBP's collection of anti-dumping and

---

[10] WAC does not argue in the alternative that a remedy provided under a 28 U.S.C. § 1581(c) proceeding would be "manifestly inadequate." Fujitsu Gen. Am., Inc. v. United States, 283 F.3d 1364, 1371 (Fed. Cir. 2002).

[11] WAC's claim that Consolidated Bearings Co. v. United States supports the notion that 28 U.S.C. § 1581(i) jurisdiction is available is unavailing. 348 F.3d 997, 999 (Fed. Cir. 2003). WAC argues that Consolidated Bearings is on point because the plaintiff did not challenge ". . . the final results of any administrative review but [rather] the 'administration and enforcement' of the AD rates determined during the course of administrative reviews." Pl.'s Br. at 17. WAC's reliance on this case is misplaced because the nature of the guidance in the two cases is distinct. There, Commerce's liquidation instructions "arbitrarily departed from its well-established liquidation practices" of determining the rate of dumping to be applied to imports at the liquidation instruction stage of an administrative review. Consol. Bearings, 25 CIT 546, 166 F. Supp. 2d 580 (CIT 2001). But the final results of the administrative review were silent regarding the plaintiff's entries. Id. This involved a separate proceeding and final determination that departed from the results of the administrative review. By contrast, here, Commerce's guidance to CBP was part of the same proceeding, and it reiterated -- and rather than deviating from -- the results of the administrative reviews from 1994 to 2001.

counvervailing duty cash deposits on Sunpreme's solar cells before Commerce had the opportunity to conduct requested scope ruling proceedings to determine whether the products were subject to antidumping or countervailing duty orders. Sunpreme, 892 F.3d at 1190. The Federal Circuit determined that this court lacked jurisdiction under 19 U.S.C § 1581(i) to hear Sunpreme's case because "it failed to wait until it had a formal scope ruling in hand prior to filing suit." Id. at 1192. Because a scope ruling would have determined whether an anti-dumping order covered Sunpreme's products, "Sunpreme was required to exhaust the administrative remedies available to it in the form of a scope ruling inquiry and scope ruling determination." Id. at 1192–93. Had Sunpreme exhausted its administrative remedies and been dissatisfied with the scope ruling determination, it could have obtained judicial relief pursuant to 19 U.S.C. § 1581(c); thus, the Federal Circuit held, residual jurisdiction under 19 U.S.C § 1581(i) did not exist. Id. at 1193.

Similarly, in Juancheng Kangtai Chemical Co., Ltd. v. United States, plaintiff Kangtai alleged that Commerce incorrectly instructed CBP to liquidate certain sales made during the ninth administrative review of the relevant duty order at the higher rate applicable to the tenth administrative review and sought jurisdiction under 19 U.S.C. § 1581(i). 2019 WL 3676346, at *4. The Federal Circuit noted that, although the pertinent sales were made during the ninth administrative review, the associated entries were not made until the tenth administrative review period. Id. at *5. Additionally, "Commerce [has] flexibility in deciding how to measure the twelve-month [period of review] covered in an administrative review, whether it be based on date of entry, export, or sale" and Commerce repeatedly indicated throughout the administrative review process that it would be relying on the date of entry to assess anti-dumping duties. Id. (citing 19 C.F.R. § 351.213(e)(1)(i) (2019)). "During the administrative proceedings, Kangtai did not directly challenge Commerce's decision to rely on entries, even though it could have;" moreover,

had it done so, Kangtai would have had recourse to judicial review under 19 U.S.C. § 1581(c). Id. at *6. For these reasons, the Federal Circuit concluded that this court lacked jurisdiction under 19 U.S.C. § 1581(i). Id.

Like Sunpreme and Kangtai, WAC forewent an available administrative procedure and instead sought to challenge an agency decision by filing a complaint in this court under its residual jurisdiction. Specifically, as has been noted, WAC failed to seek an administrative review to determine whether WQ was entitled to the WG 0% rate. Indeed, WAC seeks the very relief associated with administrative reviews -- determinations (1) that an exporter is not controlled by the Chinese government;[12] and (2) to 'collapse' WQ with other WG companies without any analysis of WQ's alleged exports of subject merchandise.[13] WAC would have possessed an adequate remedy under 28 U.S.C. § 1581(c) had it disclosed its entries of TRB merchandise as subject to the AD Order and then asked Commerce to review WQ. WAC thus attempts to invoke the court's residual jurisdiction to circumvent its failure to exhaust the administrative remedies provided to it through normal anti-dumping administrative review procedures. In sum, WAC

---

[12] The question whether a particular producer/exporter is part of a "PRC-wide entity" must be raised during the course of antidumping duty proceedings, see Dongtai Peak Honey Indus. v. United States, 777 F.3d 1343, 1353 (Fed. Cir. 2015), and are therefore reviewable exclusively under 28 U.S.C. § 1581(c). See Dongtai Peak Honey Indus. v. United States, 777 F.3d 1343, 1353 (Fed. Cir. 2015).

[13] The Government has stated that in the ongoing 19 U.S.C. § 1592 proceeding, CBP may determine whether WAC violated anti-dumping laws. "WAC may provide written and oral comments to CBP in response to the pre-penalty notice, and, if CBP agrees with WAC's arguments, the agency must issue a 'written determination' 'that there was no violation.'" Def.'s Br. at 22 (citing 19 U.S.C. § 1592(b)(2)). "Any penalty may also be reviewed by CBP Headquarters under 19 U.S.C. § 1618 should WAC elect to avail itself of this permissive remedy." Def's Br. at 22. Should CBP determine that there was a violation, WAC can challenge CBP's findings in a 19 U.S.C. § 1592(e) action, see supra p.4 (a defendant is entitled to a trial de novo "on all issues"), making the court's residual jurisdiction again unavailable. As the Government has represented in its filings in this court, WAC could raise its due process claims in that action because Commerce's memorandum was a communication to CBP during the course of its investigation.

could have challenged the results of such administrative reviews in a 28 U.S.C. § 1581(c) action if it were dissatisfied with the results, and thus 28 U.S.C. § 1581(i) jurisdiction is unavailable.

> II. *Commerce's guidance to CBP is not a reviewable final agency action ripe for judicial review.*

In a further effort to establish jurisdiction, WAC contends that Commerce's memorandum memorializing its guidance to CPB is a final agency action and ripe for judicial review. The court is not persuaded. The APA defines an "agency action" as including "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Generally, for an agency action to be "final," two conditions must be satisfied: (1) "the action must mark the 'consummation' of the agency's decision-making process -- it must not be of a merely tentative or interlocutory nature;" and (2) "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" Bennett v. Spear, 520 U.S. 154, 177–78 (1997) (citing Chicago & Southern Air Lines, Inc. v. Waterman S. S. Corp., 333 U.S. 103, 113 (1948); Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic, 400 U.S. 62, 71 (1970)).

Bennett provides an instructive example of a final agency action. In that case, the Department of the Interior ("DOI") issued a biological opinion concluding that a federal water project would jeopardize two endangered species of fish. 520 U.S. at 157. But the DOI's opinion also stated that maintaining minimum water levels in two of the project's lakes would minimize harm to the fish, and that the federal agency administering the project could continue with the project if it complied with the DOI biological opinion. Id. at 159. The Supreme Court held that the DOI biological opinion was "final" because it (1) stated the DOI's conclusion that the project would jeopardize the existence of two species and (2) obliged the federal agency administering the project to comply with certain conditions to carry out the project. Id. at 178. Because the federal

agency could only continue with the project by complying with the stipulations, the biological opinion "alter[ed] the legal regime" to which the administering agency was subject. Id.

By contrast, an agency action is not "final" if it "serve[s] more like a tentative recommendation than a final and binding determination." Id. (discussing Franklin v. Massachusetts, 505 U.S. 788, 798 (1992)) (internal quotations omitted). Similarly, an agency action is not "final" if it is "purely advisory" and does not "affect[] the legal rights of the parties." Id. In Franklin, Commerce's presentation to the President regarding the results of the decennial census did not constitute a final agency action because it had "no direct consequences" and was not a "binding determination." 505 U.S. at 798. Similarly, in Dalton v. Specter, an agency's recommendations that were not binding on the President were not "final" because the President had discretion to accept or reject them. 511 U.S. 462, 478 (1994).

In the present case, Commerce's communication to CBP does not constitute a final agency action because it does not satisfy the Bennett prongs -- the memorandum neither marks the completion of an agency's decision-making process nor affects the legal rights of the parties. Bennett, 520 U.S. at 177–78. First, Commerce's communication does not mark the consummation of its decision-making process because the agency did not make a decision concerning WQ's AD rate. Instead, it reported the results of the 1994 to 2001 administrative reviews. Compl. ¶ 31. Like Commerce's presentation to the President in Franklin, the determination communicated what Commerce had previously determined, and it was not binding given that a 19 U.S.C. § 1592(e) enforcement action is not necessarily forthcoming and there are no other "direct consequences" that follow the determination. 505 U.S. at 798. Consequently, its memorandum is "advisory" and "interlocutory in nature" because CBP ultimately determines whether to bring a 19 U.S.C. § 1592(e) enforcement action. Id. (holding that a report making a recommendation but carrying

no direct consequences is not a final agency action). While CBP does not have authority to modify Commerce's determination concerning the anti-dumping rate, see J.S. Stone, Inc. v. United States, 27 CIT 1688, 1691, 297 F. Supp. 2d 1333, 1338 (2003), aff'd, 111 F. App'x 611 (Fed. Cir. 2004), as discussed above, it is the responsibility of WQ to establish its independence in an administrative review to ensure the anti-dumping rate it desires applies to it. Therefore, the memorandum fails to meet the first prong because it did not communicate a new Commerce decision. The agency merely reported the results of prior administrative reviews to CBP, and CBP -- not Commerce -- will ultimately decide whether to bring a 19 U.S.C. § 1592(e) enforcement action against WQ. Because Commerce's CLU Memo is not a final determination, it is not ripe for judicial review.[14]

Commerce's communication also fails to meet the second Bennett prong -- that agency action requires "legal consequences" for the parties. Bennett, 520 U.S. at 177–78. Informing CBP which affiliates of WG had been reviewed during the 1994 to 2001 period does not "affect[] the legal rights of the parties" because WQ's AD rate has remained unchanged for approximately three decades. Bennett, 520 U.S. at 177–78; Letter from Department of Commerce to File; Pl.'s Br. at 7. The question of whether the WG AD rate applies to WQ was settled during the 1994 to 2001 administrative reviews of WG. During the reviews, which were conducted over two decades prior to Commerce's communication, WQ was not reviewed because it did not identify itself as an exporter for the group. To be reviewed, WQ "should [have been] identified on the organizational chart submitted to Commerce in 1996." See Letter from Department of Commerce to File. If Commerce did not review WQ, then that company was part of the China-wide entity at the time

---

[14] Courts generally consider two principal factors in determining whether an agency action is ripe: (1) whether it is final and (2) the hardship to the parties of withholding court consideration. Abbott Labs v. Gardner, 387 U.S. 136, 148–49 (1967). Because Commerce's communication does not meet the first prong, it is not ripe for judicial review.

of the subject entries. Because WQ was not reviewed, it received the country-wide rate when it exported the subject merchandise. Commerce's 2015 communication did not change the parties' "rights or obligations" because, as previously discussed, it did not alter WQ's AD rate, but instead advised CBP on its previous proceedings. See Franklin, 505 U.S. at 798. By contrast, a CBP enforcement action requiring WQ to pay a penalty would alter WQ's obligations. But like the agency's recommendations in Dalton, CBP may elect not to take an enforcement action against the parties upon completion of its investigation. 511 U.S. at 478. Since Commerce's communication to CBP does not alter WQ's rights or obligations, it fails to constitute a final agency action. Instead, what WAC asks for resembles an advisory opinion.

Finally, the facts of this case are distinguishable from those in Bennett because there, the DOI granted petitioners newfound permission to act in a prescribed manner; DOI did not merely restate preexisting facts. Commerce did not direct CBP to apply a certain rate to WQ; instead, Commerce informed CBP of what the WG rate had been and to whom it applied. It merely reiterated that WQ had not been reviewed. In short, Commerce did not issue a new determination or alter the legal regime. The memorandum to CBP was not a final agency action.

## CONCLUSION

For the foregoing reasons, the court grants the Government's motion to dismiss the complaint for lack of subject matter jurisdiction.

/s/  Gary S. Katzmann
Gary S. Katzmann, Judge

Dated: August 19, 2019
         New York, New York